AMERICAN BONDING CO. OF BALTIMORE v. CITY OF OTTUMWA.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1905.)

No. 2,131.

**1. PRINCIPAL AND SURETY—NOTICE TO SURETY.**

Under a contract to keep in repair the pavement of a street for seven years, which provided that such repairs would be made on notice from the city engineer and street committee, where one or more previous notices were signed by the city solicitor, reciting that it had been so ordered by the city council, and the guaranty company had recognized the

sufficiency of such notice by making the required repairs and paying therefor, *held*, that these facts justified the reliance of the indemnitee upon the sufficiency of a third like notice calling for further repairs.

**2.** MUNICIPAL CORPORATIONS—PAVING—REPAIRS.

A contract called for the paving of a street in the city of Ottumwa, Iowa, to be constructed with a stone curbing, with a foundation of broken stone and sand, and a six-inch concrete superstructure thereon, with a surface layer of two inches of asphaltum, to be kept in repair by the contractor for seven years. After its completion and use it soon became perforated with holes, which the contractor undertook to repair by patchwork. The condition of the asphalt surface continued, however, to grow worse, greatly interfering with the use of the street. After thorough examination by experts, they reported that on account of the rotten material and bad workmanship in the asphalt coating what was left of the asphalt would not be sufficient to make a serviceable binding for the patchwork, and therefore it was in the interests of economy and business judgment to relay the entire surface asphaltum coating. *Held*, that as applied to the whole pavement as a unit this resurfacing was of the nature of repair work.

**3.** SAME—LIABILITY OF SURETY.

While the undertaking of the surety must be narrowly construed, and can neither be varied nor enlarged, like any other contract it is the spirit as much as the letter that gives to it vital effect. So where the original contract for asphalt coating of the street called for two inches, and the repair work thereof by the city consisted of an asphalt coating of one and one-half inches, with a one-inch binder, and the contract further provided that the estimated qualities for paving, etc., should be considered as approximate, reserving to the city the right to increase or diminish said quality as in its opinion may be necessary, *held*, that such variation did not discharge the surety from its liability for such repair work, it appearing that this change entailed no additional cost to the guaranty company.

**4.** SAME—ULTRA VIRES.

The defense of ultra vires, based upon the contention that a supplemental contract for paving a street varied in some particular from the original contract, cannot avail the guarantor when its indemnifying bond expressly refers to such supplemental contract, and there is no evidence in the record that the city in making such supplemental contract did not observe the provisions of the state statute in the matter of advertising.

**5.** SAME—RAISING FUND FOR REPAIR.

Where, under such paving contract, it is provided that the contractor shall guaranty his work for the period mentioned from deterioration caused by improper materials or neglect in the construction of the same, and that upon due notice of such deterioration the contractor shall repair the same, and in default thereof said work shall be done by the city, and that then suit shall be instituted against the principal and his surety for the collection of said cost of repairs, *held*, that it is no defense by the guarantor to an action by the city to recover such cost of repairs that the city council in raising the necessary money with which to make such repairs proceeded under the statute authorizing it to issue bonds, as in the case of an original construction work in grading and paving a street.

**6.** SAME—INSTRUCTIONS—HARMLESS ERROR.

Although the court in its charge to the jury stated that the guaranty company was organized to transact business of this kind within the state, not as an accommodation guarantor, but for a consideration, *held*, that this could not constitute reversible error, where it is immediately followed with the statement that notwithstanding such fact the guaranty company was entitled to be fairly dealt with; that as a surety it was a favorite in law; that its liability could not be in any way changed or extended; and that it has the rights and privileges that any other surety would have.

(Syllabus by the Court.)

. In Error to the Circuit Court of the United States for the Southern District of Iowa.

On the 6th day of July, 1898. the city of Ottumwa, in the state of Iowa, entered into a contract with the Assyrian Asphalt Company, of Chicago (hereinafter for convenience called the contractor). for the grading, curbing. and paving of a portion of West Second street in said city. The portions of said contract bearing upon the questions to be decided are substantially as follows:

The contractor was to furnish all the necessary materials, labor, and tools to grade, pave, gutter. and curb, in a good and substantial manner. West Second street to the east line of Clay street, to be completed on or before the 15th day of October, 1898. The work under the contract was to be staked out by the city engineer. Upon the completion of the grading and setting of the curb the contractor was to notify the city engineer, who should proceed to examine the same. Section 15 of the contract is as follows:

"The contractor expressly guarantees to maintain the pavement and curbing in good order for a period of seven years, and binds himself. his heirs and assigns. to make all repairs which may, from any imperfection in said work or materials, or from any crumbling. or disintegration of the materials become necessary in that time and the said contractor shall, whenever notified by the city engineer and street committee, or if they are not made within the proper time, the street committee shall have the power to cause such repairs to be made and have the cost of the same charged to the said contractor, and deducted from any moneys due under the contract, or that may afterwards become due; or, if in case there be no funds due the said contractor, then suit shall be instituted against the principal and his sureties for the collection of said cost of repairs, and said bond shall be conditioned.

"At the end of the seven year period, the city engineer and street committee must determine whether or not the street is in good order, and the principal and his sureties shall not be discharged from liability on their guarantee and maintenance bond until the city engineer or street committee shall certify in writing that the said pavement is in good order, natural ordinary wear and tear excepted. If at any time during the seven year period, the pavement or curbing or any part of it has deteriorated through neglect in construction or improper material, to such an extent as to require reconstruction in the opinion of the city engineer and street committee, by the consent of the city council, then upon due notice, or within a period of three months from date of said notice. the contractor shall proceed to reconstruct the pavement or such part as is deemed necessary as aforesaid.

"If the contractor fails to do so at the end of three months, the street committee may, with the consent of the city council, proceed to reconstruct the pavement and curbing and the cost thereof shall be collected by suit from the said contractor or his sureties.

"There shall be nothing in the above guarantee clause that shall require the contractor to make repairs, or relay any pavement made necessary to repair or relay by the taking up and relaying of the same by water, gas, steam or plumbing companies, or street railroads, or through any improvements made by the city or by any private parties. of any nature, it being the intention that the contractor shall guarantee his work for the period mentioned. from deterioration caused by improper materials or neglect in the construction of the same; the ordinary natural wear and tear to be excepted.

"The contractor shall execute to the city of Ottumwa a good and sufficient bond, with sureties approved by the mayor, for the faithful performance of the requirements of this guarantee clause to the amount of forty (40) per cent. of the contract cost of all the work covered by this contract, which bond shall be in addition to the bonds required by law and the ordinance of the city of Ottumwa, and shall be executed to the city and approved by the mayor before the certificates herein provided are endorsed and turned over to the contractor."

By section 17 the contractor was required, without cost over and above the contract price per square yard for brick paving, to remove. where necessary, the present stone pavement within the .seven-foot strip of the street railway,

and to excavate the entire seven feet to a depth of fifteen inches below the center grade of the finished pavement.

Section 19 prescribed how the railroad company should lay its ties, etc., after the subgrade of the track was prepared, and subsequent provisions directed how the brick should be laid, etc.

After prescribing the grading, section 24 described the foundation for the sheet asphalt pavement between the street railway and the curb. There was to be a base of four inches of hard limestone, vitrified brick, or slag, two inches of clean coarse sand and gravel, each layer of sand to be flooded, the whole well rolled with a steam roller of ten tons. After the lower portions had thus been brought up to the eight-inch surface below the finished pavement, all portions of the surface that are more than two inches, but not more than six inches, below the surface of the finished pavement shall be filled with a layer of hydraulic cement concrete, of such depth that the top surface of the concrete after ramming shall be two inches, and parallel to the surface of the finished pavement. The cement was to be of the best quality, fresh American Natural Hydraulic cement, equal to the Black Diamond Brand of Louisville cement, to be prepared and put down in a specified way. Upon the concrete course should be laid a wearing surface two inches thick, the matrix or binding materials of which should be an asphaltic cement, prepared with 99 per cent. pure asphalt of the best quality obtainable, equal in quality or superior to that obtained from Pitch Lake in the Island of Trinidad. This is followed by a prescription as to the preparation of the asphaltic cement. Specifications for curbing were then made.

The whole contract price for this work was $34,538. The city was not to become debtor or pecuniarily responsible to the contractor for said work; but the city agreed and bound itself to take proper steps to assess and levy a special tax upon the property of the abutting owners upon the lines of the street liable therefor for the just and true proportion of the contract cost and expense of the improvement contracted for, according to the ordinances of the city and the laws of the state; that as to all portions of the street not embraced in the intersections the city was to make the special assessments and levies of taxes for the purposes aforesaid.

On the following September, 1898, the parties entered into a supplemental contract, modifying the provisions respecting the paving of the street railway track, which was to have been filled with brick and sand, by requiring it to be filled with concrete of the kind and character specified in the original contract, within two inches of the top of the paving, said two inches to be of asphaltum. It was further stipulated that the bond originally given by said contractor, the bond to be given after the completion of the work, should embrace and cover the improvement included in said seven feet as the same was modified and changed by the supplemental contract, in all respects as though the same had been constructed and finished as specified in the original contract. The cost of this improvement should be assessed to the street railway company, the contractor to keep the improvements embraced in the seven feet in good repair for seven years after the acceptance of the same as provided in the contract.

After the completion of said work the said Assyrian Asphalt Company, with the American Bonding & Trust Company of Baltimore City as surety, executed bond to the city in the penal sum of $14,000, which, after referring to said contract as the consideration for the execution of the bond, recited the following conditions: "Now, if said Assyrian Asphalt Company shall make good to the city of Ottumwa, Iowa, and furnish in good order and replace any brick, asphalt, concrete or other materials used in said paving and curbing, which may fail from any imperfections in the work or materials, for a period of seven years from the completion of said work, and if the said Assyrian Asphalt Company shall keep the said improvement and pavement in good repair for a period of seven years from and after the acceptance of the same by the city of Ottumwa, then this bond to be void and of no effect, otherwise to be in full force and effect."

The said American Bonding & Trust Company of Baltimore City afterwards became the American Bonding Company of Baltimore, which assumed the guaranty bond of its predecessor.

The construction work on this street was completed by the contractor and accepted by the city, and paid for by the issue of certificates, to be paid by assessments and levies on the property owners aforesaid.

It was not long thereafter until the use of the street demonstrated the fact that the asphalt coating, from improper material and bad workmanship, was in wretched condition. It wore into holes in many places, greatly interfering with travel over it. Notice thereof was given to the contractor and the surety company by the city solicitor, under direction of the city council. The contractor responded, and made what it called repairs, by patching the holes and worn places. It was not long, however, perhaps in the following year, until greater defects in the asphalt appeared, of a more serious character. Upon like notice an attempt was made to again make repairs. After two of such repairs had been made by the contractor it appears that it became insolvent.

Again, on the 15th day of April, 1902, Mr. Jaques, city solicitor for said city, sent to said contractor and to said bonding company a written notice, calling attention to the execution of the indemnifying bond aforesaid, with the following statement: "I am instructed as solicitor of the city of Ottumwa, Iowa, by the city council thereof, to notify your company, that the Assyrian Asphalt Company have wholly failed to comply with their agreement as provided for in said bond and in its contract with said city for paving the street therein named. That said pavement is now and has for a long time been out of repair, full of holes, the material has become rotten and decayed to such an extent that nearly the whole surface of the street needs replacing. That the city claims that the entire sheet of asphaltum on said street has proven to be of inferior and defective material and that it will not stand or last for the seven years as provided in said bond and that you are hereby notified to repair and replace the same at once, or within the shortest practicable time; failing to do so the city will hold you liable on said bond. You are further notified that a duplicate of this letter is this day mailed to the Assyrian Asphalt Company and this is intended to be and is demand upon both you and said company at once repair said street and put it in that condition provided for in the contract for paving of the same in your bond to which reference has been made, of all of which you will take due notice and govern yourselves accordingly."

The receipt of this letter of notice was acknowledged on the 18th day of April, 1902, by William M. Reinhardt, attorney in charge of loss and claim department of said bonding company, stating "that we will give this matter our immediate attention, and will be pleased to communicate with you again within the next few days."

On the 13th day of May, 1902, said Jaques wrote to said Reinhardt acknowledging receipt of said letter of April 18th, in which he stated: "I am instructed by the city to say that Mr. McGarry, the representative of your company, was here some three weeks or more ago, and promised that the repairs would be made as desired by the city, but in so much as we have not heard anything since, I am again instructed to call your attention to the fact. The street is getting worse every day, and to request that you use as much expedience in repairing the street as is practicable."

To this letter said Reinhardt replied on May 17, 1902, saying: "In reply would say that we are in receipt of Mr. McGarry's report, and we have been obliged, in the last few days, to submit the matter again to our representatives in Chicago, Messrs. C. M. Haven & Co., asking them to give this paving matter their attention immediately. We realize the necessity of making these repairs with the least possible delay."

Thereafter the said bonding company sent one St. Clair, who had worked for the contracting company on this pavement, to Ottumwa, to make the repairs, who made repairs to the extent of about $600, which were paid for by the said bonding company.

It was not long, however, thereafter until the condition of the pavement grew worse, and on the 17th day of February, 1903, said Jaques, city solicitor, sent to the said bonding company the following letter: "Gentlemen: You are hereby notified that the city council of the city of Ottumwa at its regular session held on the 2d day of February, 1903, directed the undersigned city solicitor to inform your company that the pavement of West Second street in

Ottumwa laid by the Assyrian Asphalt Company, whose durability was guaranteed by your company for seven years, has again become greatly out of repair, and to say to your company that unless the same is repaired on or before the 1st day of March, 1903, that the city will cause the same to be repaired as a charge against you under said bond and at your expense. The extent to which said street is out of repair can only be described by saying that it has holes worn in the top or asphaltum coat at many places for its entire length. You will oblige me by notifying me whether your company will undertake to make the improvements or repairs as requested by the city council and as required by the condition of the street."

And on the same day he sent a letter to the said Assyrian Asphalt Company, which is as follows: "Gentlemen: You are hereby notified that the asphalt pavement laid by you on West Second street in the city of Ottumwa, Iowa, is out of repair for nearly if not all its entire length in this that the top or asphaltum coat has worn into holes at places throughout its entire length and that the city council has passed a resolution requiring you to repair the same on or before the 1st day of March, 1903, and has so notified the American Bonding & Trust Company of Baltimore, Md., surety on your bond for keeping the same in repair."

Although the above letter was received, said bonding company paid no attention to it. Thereafter, on May 22, 1903, Jaques sent another letter to said bonding company, as follows: "For your information, insomuch as you are surety for the Assyrian Asphalt Co. for the maintenance of the pavement therein named, I enclose you notice for bids for repairing the same. The city expects to hold your company responsible to the extent of the bond given, for these repairs. You can bid on the same if you so desire."

This was sent by registered mail, and contained the notice to bidders for said work. The said bonding company gave no heed to this letter.

The city had the best known experts in such paving work to visit the city and make careful examination of the condition of the street, who reported to the city that the asphalt coating was in such condition because of rotten material, so perforated with holes, that in their judgment it was neither in the interest of sound economy or good business judgment to undertake its repair by patchwork. Accordingly the city, after adopting the necessary ordinances, and advertising for bidders, let the contract for the work of relaying the entire surface in Trinidad cement, one and one-half inches in thickness, with a one-inch binder; which work cost $21,639.40, to pay for which the city issued bonds, to be paid by assessments on the adjacent property owners.

Other facts bearing upon the questions to be decided will be discussed in the following opinion.

The city brought action against the bonding company on its bond to recover for the cost of said work to the extent of $14,000, the penal sum expressed in the bond. The bonding company made answer, tendering, in effect, the general issue, and pleading specially that the city did not give it the required notice before undertaking to do said work itself. Afterwards the said defendant filed a supplemental answer, alleging that the bond sued upon is illegal and invalid for the reason that the principal and surety therein were required to keep and maintain said pavement in good repair for a period of seven years without exception or reservation, regardless of the cause necessitating the repairs, whereby the expenses of such maintenance were imposed upon the individual owners of the abutting property because of the cost of combining the original work with that of seven years' maintenance in awarding the contract, etc. And finally it pleaded, in further amendment to the answer, that the city of Ottumwa was without authority in law to enter into the contracts and bonds set forth in the petition, and that the act of the city in so entering into said contracts and bonds was ultra vires.

On trial to a jury verdict was rendered in favor of the plaintiff below in the sum of $14,000, the penal sum of the bond; to reverse which the defendant below prosecutes this writ of error.

William C. Howell and Charles A. Houts (H. Scott Howell and Johnson, Houts, Marlatt & Hawes, on the brief), for plaintiff in error.

137 F.—37

W. H. C. Jaques (William McNett, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and PHILIPS and RINER, District Judges.

PHILIPS, District Judge, after stating the facts, delivered the opinion of the court.

The principal question presented on this record is whether or not the work done by the city was of the nature of repair or reconstruction. The contention of plaintiff in error is that the work done was reconstruction, and not repair, and that it did not receive the required notice stipulated for in section 15 of the contract, in that the notice did not come from the city engineer and street committee, to warrant the work by the city if it was of the nature of repair, and the three-months time after the notice that was given if the work was of the nature of reconstruction.

As the city engineer and street committee were but the ministerial officers of the municipality, which is governed by a board of aldermen, it would seem that when the city solicitor was directed by the board of aldermen to give the notice it should be regarded as of a higher source than if it came from the city engineer and street committee. But be this as it may, it is a sufficient answer to this contention to say that the said bonding company had recognized and acted upon a like notice sent to it by the city solicitor within the year previous to the last notice, and undertook, at its own expense, to make the repairs, and paid therefor. This conduct on its part induced the belief that such notice was satisfactory and sufficient. The condition of the street, as represented in the letter of April, 1902, was as bad if not worse than the condition represented in the letter of February, 1903. And yet the bonding company made no answer thereto, and took no notice thereof, although the city waited three months thereafter before it began the work in question. It should not, therefore, be heard to make this defense after the city has done the work which the guarantor's bond required that it should have done, if the thing done by the city was repair work.

We are therefore brought to a consideration of the question as to whether the improvement was of the nature of repair or reconstruction work. The evidence showed that the defective condition of the street was wholly in the asphalt coating. That portion of it in controversy was honeycombed with holes, worn through to the concrete base. The evidence tended to show that both the workmanship and material in the original construction were essentially bad, so that what was left of it about the holes was, in the judgment of the experts, so rotten and insufficient as not to furnish sufficient support for the walls around the decayed and worn parts when dug out for the reception of the asphalt, and that the only effective remedy for this restoration was the removeal of the whole surface and recoating it. And the jury so found under the charge of the court touching this issue.

It may be conceded that there are some varying shades of difference in the general definition of the term "repair." But there is none more apt and comprehensible than the accepted dictionary definition: "To restore to a sound or good state after decay, injury, dilapidation, or partial destruction." As said by Judge Colt, speaking for the Court of Appeals for the First Circuit, in Goodyear Machinery Company v. Jackson et al., 112 Fed. 146–150, 50 C. C. A. 159, 163, 55 L. R. A. 692:

"Repair is 'restoration to a sound, good, or complete state after decay, injury, dilapidation, or partial destruction.' Reconstruction is 'the act of constructing again.' Reproduction is 'repetition,' or 'the act of reproducing.' These definitions are instructive in bringing home to the mind that repair carries with it the idea of restoration after decay, injury, or partial destruction, and that reconstruction or reproduction carries with it the idea of a complete construction or production over again. * * * It is impracticable, as well as unwise, to attempt to lay down any rule on this subject, owing to the number and infinite variety of patented inventions. Each case, as it arises, must be decided in the light of all the facts and circumstances presented, and with an intelligent comprehension of the scope, nature, and purpose of the patented invention and the fair and reasonable intention of the parties. Having clearly in mind the specification and claims of the patent, together with the condition of decay or destruction of the patented device or machine, the question whether its restoration to a sound state was legitimate repair, or a substantial reconstruction or reproduction of the patented invention, should be determined less by definitions or technical rules than by the exercise of sound common sense and an intelligent judgment."

In Wilson v. Simpson et al., 9 How. 109, 13 L. Ed. 66, the court said:

"When the wearing or injury is partial, then repair is restoration, and not reconstruction. * * * Repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a *replacement of an essential part of a combination.*" (The italics are ours.)

The foregoing statement that it would be a repair to replace an essential part of a combination is most applicable to the case in hand. Under the contract the thing to be done by the contractor was in a sense a unit. It was to construct a pavement, the base of which was to be six inches of hard concrete, with a one and one-half inch surface of asphalt, with stone curbing. These constituted the work of construction. Reconstruction is "to construct again, to rebuild, to remodel, to form again or renew." It would therefore follow that to constitute a work of reconstruction of the pavement would involve the rebuilding of the whole unit, including the concrete foundation as well as the asphalt surface, to say nothing of the curbing. Whereas the thing done by the city was to cure the deterioration, owing to the rottenness of the material employed and bad workmanship, whereby what remained of the surface did not possess sufficient cohesion to admit of patchwork, necessitating simply relaying this portion of the structure, leaving all the rest intact. If, as it must be conceded, it would have been repair to have dug out throughout the length of the street the holes in the surface and relaid them with new asphalt, no matter how multitudinous the holes or thin the partition walls between them and the relaid portions, it must be a distinction without a difference

in making a continuous surface, if that was essential "to restore to a sound or good state after decay, injury, dilapidation, or partial destruction."

A contract for the building of a house complete includes the foundation, the walls, and the roof. Should the contract provide that the contractor should keep the building in repair for seven years, and within a year after the acceptance of the work the roof should begin to leak in various places, it would be repair work in restoring the defective parts to a sound condition. If then, within the next year, the leaks in the roof should become worse, rendering the building practically uninhabitable, it would be repair work if the contractor should be called upon to rectify such a condition in the roof. If again thereafter, within a few months, the leakage should continue, throughout almost the entire roof, and a thorough examination of this covering should disclose the fact that the roof was constructed of bad material, and with bad workmanship, that the material was so rotten throughout that mere patching the holes would afford no permanent protection against the disintegrating parts, necessitating the removal of the entire rotten roof and putting on a new covering, why should this be any less a repair of the building? Would it not be a mere restoring of the part "to a sound or good state after decay, injury, dilapidation, or partial destruction," consequent upon the bad workmanship and the rotten materials used? If one-half of the roof should decay so as to admit through it the rain, snow, and winds, to restore to a sound state would certainly be regarded as repair of the building. Does it any the less amount to repair that the decay or dilapidation extends to the other half of the roof?

The result of the court's charge on this issue was that he told the jury that in his opinion what was done amounted to repair and not reconstruction. While the contract did not call for reconstruction, it did call for recoating the pavement with asphalt, which, in his judgment, amounted to repair, and not rebuilding or reconstruction. Inter alia, he said:

"It does seem to me like reconstruction would be a revamping, or reworking the whole thing over. The base was not changed; no change of the grade was made; no change in the curb. The change that was made was resurfacing, the recoating of the top; that and the holes of course where the wagon wheels would pound down in the concrete, making recoating necessary."

Criticism is made of the employment of the term "revamping." How this can avail the plaintiff in error is not apparent. If prejudicial at all, it was rather against the defendant in error. As shown by the context, the court merely conveyed the idea to the jury that it was the equivalent of "working the whole thing over."

The fourth clause of paragraph 15 of the contract provides that the contractor should not be required to make repairs or relay any pavement made necessary to repair or relay by the taking up and relaying of the same by water, gas, steam, or plumbing companies, or street railways, or through any improvements made by the city or private parties of any nature; it being the intention that

the contractor shall guaranty his work for the period mentioned from deterioration caused by improper materials or neglect in the construction of the same, natural wear and tear excepted. The plain meaning of this is that the destruction of the pavement after completion by the contractor by tearing up, not only the surface, but the cement beneath, by said improvement companies, or for making improvements by the city or private parties, should not cast the burden upon the contractor of repairing or replacing. But it expressly obligated the contractor "to guarantee his work for the period mentioned from deterioration caused by improper materials or neglect in the construction of the same." Therefore any deterioration resulting from bad materials or bad workmanship in the original construction was to be a work of repair, to be done by the contractor.

It is suggested, as evidencing that the work done by the city was reconstruction rather than repair, that it cost over $21,000, while the entire contract price of the original work amounted to a little over $34,000. There is nothing in this record to enable the court to find what is the relative cost of the asphaltum surface and the other portion of the pavement. If the work done by the city is more expensive than that done by the Assyrian Asphalt Company, it is the difference between genuine and shoddy work. The evidence is that the cost of the work done by the city was not only reasonable, but without profit to the contractor. The opportunity was offered to the plaintiff in error to either do the work itself or bid on it. Its obligation was and is to pay the cost of the repair, if reasonable, no matter how much or how little.

It is conceded to the plaintiff in error that the undertaking of the surety must be narrowly construed. It cannot be varied or enlarged. But like any other contract, it is the spirit as much as the letter that gives to it vital effect. It is substance rather than mere shadow that denotes variation from its terms. The essence of the bond of the plaintiff in error was that for a period of seven years the Assyrian Asphalt Company should furnish, in good order, and replace, any asphalt or other materials used in said paving which might fail from any imperfection in the work or materials; and its bond was only to become ineffective in the event the said Assyrian Asphalt Company "shall keep said improvements and pavement in good repair for a period of seven years"; the spirit—the clear meaning—of which is that whenever during that period the work done by the Assyrian Asphalt Company should fail to give a good pavement by reason of any imperfections, either in the workmanship or the materials employed, it should be replaced so as to effectuate the purpose of giving the city a serviceable street for said period, when built right with the materials prescribed or their equivalent. If it failed to do so, then, after due notice, the city was authorized to make the required repairs at the cost of the asphalt company or its surety.

The authorities cited by counsel for plaintiff in error, for the purpose of showing that the work done by the city was of the nature of reconstruction and not repair, are not apposite. In State

ex rel. v. Corrigan Street Railway Company, 85 Mo. 263, 55 Am. Rep. 361, the street railway track was put upon Union avenue when it was an unpaved street. The city ordered it graded and paved, prescribing the materials and the manner of construction. By ordinance it demanded of the street railway company that it pave between its rails and for two feet on the outside thereof, in the same manner as that done by the city. This ordinance was resisted by the street railway company, on the ground that it required of it a complete work of construction, by putting in the foundation and the whole material as for paving a street in the first instance; whereas, under the law governing the obligation of the street railway company, it was only required to keep in repair the space between the rails and for two feet on the outside. This was clearly a work of construction from top to bottom.

In the case of Farraher v. City of Keokuk, 111 Iowa, 310, 82 N. W. 773, under a statute which gave to the city the right to make repairs without notice, and assess the cost against the abutting property, a sidewalk was taken up from top to bottom and relaid, by digging a ditch, filling in a new substratum of sand, and putting down a new sidewalk, employing in this work only a small amount of the old material. This was held to be essentially the creation of a new pavement.

In Chicago v. Sheldon, 9 Wall. 50, 19 L. Ed. 594, the street railway company agreed that "as respects the grading, paving, macadamizing, filling or planking of the streets or parts of streets, upon which they shall construct their said railways, or any of them, keep eight feet in width along the line of said railway on all the streets where one track is constructed, and sixteen feet in width along the line of said railway where two tracks are constructed, in good repair and condition." It was held that this did not make the company liable for curbing, grading, and paving streets with an entirely new pavement, as the obligation of the company extended only to repairs. Clearly that is not this case.

Other cases are cited by counsel, like that where, by the contract, the foundation was to be of wood, and one of stone was substituted therefor. This was clearly a reconstruction of the very foundation work, with a different and more expensive quality. But no case has been cited, nor are we able to find any adjudicated case, that sustains the proposition that as to the resurfacing of the principal concrete base, necessitated by the unfitness of the material, and the work being essentially bad, under the circumstances of the case at bar would not come under an obligation to repair.

Complaint is made by plaintiff in error that the city, in the work done by it, used Trinidad asphalt instead of that employed by the contractor. This was no departure in spirit, for the reason that the contract itself called for pure asphalt equal to, if not better than, Pitch Lake, in the island of Trinidad.

It is next objected that the city varied from the original contract in that it put on an asphalt coating of one and one-half inches, with a one-inch binder, whereas the original contract called only for a

two-inch coating of asphalt.   By section 34 of the contract· it was expressly provided that:

"The estimated qualities for grading, paving, curbing, and guttering streets are to be considered as approximate, and said city of Ottumwa reserves the right to increase or diminish said quantities as in their opinion may be necessary, either in change of grade, alignment or otherwise; and such alterations shall not vitiate or annul the contract entered into relative to said work; nor shall such change constitute any claim for extra compensation. The contractors shall be paid for the amount of work actually performed at the rate specified in his contract, and if any work is ordered, not provided for in the contract, the engineer shall determine the value thereof."

—From which it is clear that the estimated qualities for the paving were to be considered only as approximate.   So that if the city, in the progress of the work, had requested and consented to a one and one-half inch layer of asphalt, with an inch binder, if it had entailed no additional expense to the contractor, it was perfectly competent for the city to require the change.   How then can it be said that when the city, in making the required repairs, employed a less quantity of asphalt on the surface, that a one-inch binder, which as the evidence shows made no perceptible difference in the cost, constituted a departure from the spirit of the contract?

It is next urged in argument by counsel for plaintiff in error that the contract was ultra vires because the supplemental contract of September, 1903, provided for sheet asphaltum outside of the space between the street car rails and that portion the city was to pave with asphaltum instead of part brick and part asphaltum, as provided in the original contract.   This contention is predicated of the assumption that this change was made without advertising for proposals thereon, as the Code of Iowa requires all such work to be let after advertisement for proposals.   If it were conceded that any such specific defense was pleaded in the answers, we fail to find in the record any evidence what the advertisement as made contained.   The original contract contemplated the giving of this bond by the contractor, and the bond executed by it, with the plaintiff in error as surety, makes direct reference to said supplemental contract, and guaranties that the contractor shall "furnish in good order and replace any brick, asphalt, concrete or other material used in said paving," which may fail from any imperfections in the work or materials for a period of seven years from the completion of said work.   As there was no essential difference in the cost of the work, and as the contract provided that this work was to be paid for by the street railway company, and the bonding company, when it gave the bond of indemnity, knew of this change in the contract, it does not lie in its mouth to raise any question about the change.   It did not affect the validity of the contract in this controversy.   Ottumwa B. & C. Co. v. Ainley, 109 Iowa, 386, 80 N. W. 510.   Code Iowa, § 814, expressly provides that the contractor shall give such bond for repairs.

With infinite reiteration, counsel for plaintiff in error argues that the city officials in their report and in the ordinances providing for the method of paying for the work in question spoke of and dealt with the matter as of a work of reconstruction.   Reference

is made to the report of one of the city aldermen, Kehoe. Quotation is made from the report that "it would be throwing away money to try to repair said street." But this officer further said: "As the surface is disintegrating very rapidly, and that the cheapest and about the only way to repair said street so it will last will be to resurface the whole street." The title of the resolution of the Board providing for this work is as follows: "Resolution levying city improvement taxes for the payment of the reconstruction of the wearing surface of West Second street;" and reads: "Whereas, * * * the Barber Asphalt Paving Compa· y undertook to relay and to repair the asphalt sheet paving in paving districts Nos. 36, 37 and part of 38," etc. The officers were not concerned about the terms they employed. It was the facts as to the actual condition of the street and work done from which the court is to determine its character.

Neither are we able to perceive the merit of the contention that the city aldermen, in adopting the ordinances providing for the issue of bonds to be sold to pay for the work, proceeded under the statute authorizing a work of construction in paving streets. How does it concern this surety company how or in what manner the city undertook to raise the money to pay for the work? How did it affect its undertaking to pay "said cost of repair"? Is it any of its business whether the city raised the necessary revenue by borrowing the money and giving its note therefor, or whether it obtained it on bonds irregularly issued? Did it alter the position or effect of the undertaking of the guarantor that the city, after the obligation of the contractor to make the repairs had attached, undertook one way or another to pay for the work which the contract imposed upon the contractor to do, without cost to the city? Should this court, in this proceeding, in the absence of the holder of the bonds issued by the city, undertake to determine their validity? As the ordinance passed by the city purported to be in pursuance of the statute, and the bonds on their face recited that they were issued in pursuance of such ordinance, they would be binding upon the city in the hands of an innocent purchaser for value.

The contract expressly provided, in section 15, that after the work under the contract was paid for, and the contractor failed to maintain the street according to the contract, "then suit shall be instituted against the principal and his sureties for the collection of said cost of repairs." As the burden of these repairs, when made by the city, was to be laid upon the property owners, the city was authorized by the contract to recover the cost thereof from the contractor and the surety. When collected it would inure to the benefit of the burden-bearers. The contracting parties might have designated any other person as a quasi trustee for the benefit of the taxpayer, to collect from the contractor and the surety such cost. Shall the court, to enable this surety to escape from this express undertaking, after it has issued the bonds of the city and paid for the cost of repairs, anticipate that the property owners will refuse to pay the levies made to meet the

interest and principal of the bonds, and further anticipate that such refusal would be upheld by the courts? There is no issue tendered by the answer in this case that there are any funds due the said contractor. As the burden of these repairs when made by the city was to be laid upon the property owners, the city is authorized to receive the cost thereof from the contractor or his surety, and when collected it would inure to their benefit or the holder of its bonds.

Criticism is made upon the following paragraph of the charge given by the court to the jury:

"Now, this bonding company has the right to contract in Iowa; it is organized for that purpose; the statutes of Iowa authorize it to transact business of this kind within the state; not as you and I sign one another's notes, as a guaranty or accommodation; but it does it for a consideration; that is the way it makes its money. So that, for a money consideration paid it, either by the city of Ottumwa or the Assyrian Company, it signed this bond, agreeing to make good the contract of the Assyrian Company with the city of Ottumwa."

It is claimed that this was prejudicial to the bonding company, because of the statement that it signed such bonds for a money consideration. This was nothing more than the statement of a well-known fact as respects such guaranty companies. But lest such fact might prejudice the defense of the bonding company said statement was immediately followed by the further statement that:

"It is a rule recognized by all lawyers and all courts and perhaps by all people that a surety upon a contract is what is called a favorite in law; that is to say, it must at all times be fairly dealt with; the contract must not be changed. It must not be enlarged upon over and above what the bond company agreed to. * * * You cannot vary it in any way."

And further on the court said:

"So that while a surety is a favorite in law, and this bond company as a surety, I suppose, stands as if you and I had signed this paper, notwithstanding it received a money consideration for signing it, it has the rights and the privileges that a surety would have; but it likewise is under the obligations and responsibilities of a surety."

Taken in its entirety, the tendency of this portion of the charge was rather calculated to guard the minds of the jury against any prejudice on account of the fact, presumptively known, that such company is not a mere accommodation indorser, and that it stood in respect of the law as any other surety.

As a whole, the charge was fair to the plaintiff in error. For while the indemnifying bond executed by the surety after the work was done might have been regarded as an unqualified undertaking for guarantying the work for seven years, the court in its charge gave the plaintiff in error the benefit of conditioning its undertaking upon the performance of all the provisions of the contract between the city and the contractor.

Other objections, of a most hypercritical character, are urged by the plaintiff in error, but they are not of sufficient merit to justify the further prolongation of this opinion. It results that the judgment of the Circuit Court should be affirmed.