LEONARD W. MAASDAM et al., Appellees, v. WILLIAM KIRKPATRICK et al., Appellants.

No. 41392.

JUNE 24, 1932.

REHEARING DENIED SEPTEMBER 30, 1932.

Cross & Hamill and O. P. Myers, for appellants.

Thomas J. Bray, for appellees.

GRIMM, J.—This is a suit brought in equity, for an injunction, by a number of landowners in Drainage District No. 17 of Jasper County, Iowa, against the members of the Board of Supervisors of Jasper County and Auditor of said county. J. W. Wagaman is intervener. He also is one of the property owners in the district. His particular interest in the controversy will be more fully described later.

Historically, it may be stated that drainage district No. 17 of Jasper County, Iowa, was established, completed and accepted by the Board of Supervisors of said county December 7, 1926. The petition for the establishment of this district had been filed with the county auditor in 1923. At the same time, Ray McMurray was appointed engineer. In January, 1924, residents of Lynnville filed a remonstrance against the establishment of a drainage district that would in any manner impair or interfere with the mill dam or water power at Lynnville which, as they claimed, was a "public necessity." Shortly thereafter, about 150 additional property owners filed a remonstrance and protest against the establishment of the ditch. On August 19, 1924, the engineer filed his report and the same was approved on the same date. On September 19, 1924, a $40,000 claim was filed against the district by Wagaman, the owner of the dam and mill at Lynnville. On September 25, 1924, the board of supervisors, by resolution, directed the engineer to make further examinations and an additional report. This additional report was made on October 14, 1924, and the engineer recommended the use of the old river channel from a point immediately upstream from the Wagaman dam to a point below the dam, a distance of about 1,290 feet. On the same day, this report was approved by the board. On November 15, 1924, appraisers were appointed to assess the damages of the improvement. It is stipulated by the parties that in the report of the appraisers filed November 15, 1924, no damages were allowed to Wagaman. Manifestly, this came about by reason of the fact that previous to that time an

understanding hereinafter referred to, between Wagaman and the Board of Supervisors, had been reached, and it was understood that the water should continue to flow over Wagaman's dam. Wagaman had agreed that if this should be done, he would drop his claim for damages. Later, the report of the appraisers was approved and a permanent survey was filed. The ditch was constructed as provided in the amended plan.

Presumptively, the purpose of the enterprise was straightening, draining and improving the North Skunk River, flowing from the northwest part of Jasper County southeasterly through Lynnville to the southeast part of the said county. It appears that the preliminary plan for the district included 12,500 acres of land, a right-of-way 100 feet wide. It contemplated about 25 miles of new ditch. About two thirds of the way from the point where this ditch started in the northwest part of Jasper County to the point where it passed out of Jasper County, there is located the town of Lynnville. At what is designated as the north end of Main Street in Lynnville, there is located in the said North Skunk River the said dam and mill of the intervener, Wagaman. The water power developed by the dam in said Skunk River is used for the purpose of furnishing power to the mill for milling purposes and for the purpose of manufacturing electricity, which for a number of years has been sold by the owner of the plant, on a kilowatt basis, to a public utility. The use of the water power at that point has existed for more than three quarters of a century. It appears that there is at that point a very suitable rock foundation and shore topography which lends itself advantageously to the construction and maintenance of a power dam. This dam was built in 1916. It is approximately 85 feet long. The construction of the dam alone cost approximately $10,000.

As previously noted, there is used in connection with said dam a flour mill, feed mill, oat huller and machinery to generate electricity and equipment for the use of the water power produced by it. This building is 30x40 feet, with 20 foot corners. The mill is fully equipped with modern, expensive, efficient machinery for the purposes hereinbefore noted. There are four floors in the building, counting the basement. This property, and about three acres of land on which it stands, is now owned

and for a long time has been owned, by said Wagaman, the intervener and appellee.

It appears that when the district was originally established, the original plans and specifications provided for constructing the ditch to the *north* of the dam and plant of Wagaman, the intervener. This would entirely destroy Wagaman's plant as far as water power was concerned. In accordance with the procedure provided for under such circumstances, Wagaman then filed his claim with the board of supervisors for the sum of $40,000. At the time appointed for the hearing of claims, the matter of the allowance of Wagaman's claim came before the board. Two of the three members of the board, now defendants, were members of the board at that time.

At this point, it may be well to state that the original assessments providing for the improvement amounted, in round numbers, to $92,725, of which $89,735 was finally levied. The actual cost of the ditch, however, was $77,842. It appears that on April 1, 1930, the amount unexpended of the original assessment was $11,163.

At the time Wagaman's claim was under consideration by the board, it became apparent that the allowance thereof would constitute a serious handicap to, if not entirely interfere with, the construction of the ditch. The record conclusively shows that while Wagaman was before the board on the consideration of his claim, an understanding was reached between the said Wagaman and said board of supervisors of Jasper County that if the plans and specifications which had then been approved should be changed so that the North Skunk River should continue to flow over the dam and through Wagaman's power plant, he, Wagaman, would not consider himself injured by the improvement and would not press his claim for the whole or any part of the said $40,000. There is an intimation in the record that the understanding was a conditional one: that is to say, the board would experiment with a change in plans and specifications providing for passing the water of the North Skunk River over the Wagaman dam, and if such operation were to be found unsuccessful, then the change would be made. There may have been some indefinite statements made around the board room to that effect, but upon a close examination of the entire record, we find that the understanding or agreement was not based upon any ex-

periment, but rather, it provided that if the plans and specifications of the ditch were so changed that, if the ditch was built, the water would continue running over Wagaman's dam, Wagaman would waive any claim for damages.

On February 24, 1930, there was filed with the County Auditor of Jasper County a petition signed by six property owners asserting, in substance, that the said property owners were seriously damaged because the mill dam at Lynnville was permitted to remain in the ditch, by reason of the fact that the dam caused the water to back up to a level which interfered with and, in some instances, closed the outlet of drainage tile intended to empty into the river bed and ditch.

On April 15, 1930, this petition was taken up for consideration by the supervisors. The board appointed the same Ray McMurray, engineer, to examine and thoroughly investigate the situation and report to the board.

On September 16, 1930, the said engineer filed his report, which, in substance, recommended changing the course of the ditch at Lynnville to conform substantially to his original report in 1924: to wit, that the ditch be built around the Wagaman dam, taking the water therefrom. The estimated expense of this change was $2,500, exclusive, of course, of any claim for damages which might, by reason of said proposed change, be filed by Wagaman.

On September 16, 1930, the supervisors approved the said report and thereby adopted an amendment to the original plans, and directed the county auditor to cause due notice to be given all owners, lienholders and all parties interested in said land included in said changed portion and relocated part of said originally established ditch. The hearing was set for November 10, 1930.

It is conceded of record that this notice was personally served October 13, 1930, on Wagaman and lienholders claiming liens on the Wagaman property, but that it was *not* served on any other property owner in said drainage district.

On November 10, 1930, Wagaman filed his claim for damages in the sum of $55,000, and on the same day, filed detailed objections to the proposed change of said river channel. In these objections, he set forth, among other things, that the change would ruin the mill property, which had existed there since

1846, thus creating a destruction of property amounting to $55,000. He also set forth his claim of an oral agreement, hereinbefore referred to, by the terms of which it is claimed Wagaman dropped his claim of $40,000 damages in consideration that the water should be permitted to continue to flow over the Wagaman dam. He also challenged the jurisdiction of the board of supervisors to make the proposed change, for the reason that there has been no compliance with the statute, in that the proposed change constitutes a new and independent improvement and that no petition signed by the owners of 35 per cent of the acreage affected and to be assessed has been filed and no bond has been filed. He also alleged that the proposed change would ruin his property and that the proposed change is not necessary and will not be conducive to public health or benefits.

On December 2, 1930, the board, by due resolution, approved the engineer's report and recommendation for a change of location. Wagaman and his counsel were before the board at that hearing. The board reached the conclusion that it had jurisdiction, and provided for the appointment of appraisers to assess damages. The appraisers on December 10, 1930, filed their report, finding Wagaman's claim for $55,000 to be worth $7,500.

On December 6, 1930, this action in equity, asking for an injunction, was filed. On May 8, 1931, the court found for the plaintiffs and the intervener and granted an injunction, as prayed.

I. The principal contention between the appellees and the appellants in this case, in the last analysis, hinges upon the question whether the proposed change of the ditch so as to run the water, not over the intervener's dam, but in a new ditch 1,290 feet long, to be constructed north of the intervener's dam and beginning at a point several hundred feet west of the dam and connecting with the old ditch several hundred feet below the dam, is a "repair," or a new construction.

It will be recalled that the original "plan" proposed by the civil engineer in charge created a completed ditch running north of the intervener's dam. After it was discovered how expensive it would be to settle with the intervener for his damages, and after 150 or more people protested against the destruction of the dam, the "plan" was changed by the engineer and the changed "plan" was adopted by the board of supervisors. It will thus

be seen that what is now proposed by the board of supervisors involves a change in the "plan" of the ditch.

The statutory provisions in reference to new work and repair work are very different. The applicable portions of Section 7428 of the Code are as follows:

"7428. *Straightening creek or river.* When the proposed drainage district involves only the straightening of a creek or river, the board of supervisors shall refuse to consider the petition unless the same is signed by owners of at least thirty-five per cent of the acreage affected by or assessed for the expense of the proposed improvement."

Clearly, this whole improvement is a plan to straighten the North Skunk River.

Section 7430 provides for a bond, and reads as follows:

"7430. *Bond.* There shall be filed with the petition a bond in an amount fixed and with sureties approved by the auditor, conditioned for the payment of all costs and expenses incurred in the proceedings in case the district is not finally established."

Section 7440 provides for a notice to be given to the owner of each tract of land or lot within the proposed levee or drainage district as shown by the transfer books of the auditor's office, including actual occupants of said land. By the terms of Sections 7556 to 7560, both inclusive, provisions are made for certain repairs and changes, the language of the statute being:

"* * * and for that purpose it [the Board of Supervisors] may cause the ditches, drains, and watercourses thereof to be enlarged, reopened, deepened, widened, straightened or lengthened, or the location changed for better service, or may cause any part thereof to be converted into a closed drain when considered for the best interest of the public, and in connection with said work may construct settling basins."

We quote also the following sections:

"7558. *Assessment without notice.* If such funds are not sufficient and the cost thereof does not exceed ten per cent of the original cost of the improvements in the district a new assessment shall be made on the basis of the old apportionment and no notice of such assessment shall be necessary.

"7559. *Assessment with notice.* If the cost thereof does exceed ten per cent of the original cost of the improvements in the district, and the nature and/or amount of work proposed differs from mere repairs as defined in Section 7561, then the board shall order a new apportionment of, and assessment upon, the lands in the district to be made; and the same proceedings shall be had and the same rules shall be applied as are provided in this chapter for an original establishment and assessment; and the same right to appeal shall be given to any interested party.

"7561. *Separate assessments for main ditch and laterals.* Notwithstanding the provisions of the five preceding sections, so much of the cost of the work and materials as is required to clean out any specific open ditch or main so as to restore it to its original efficiency or capacity and to preserve its sides at a practical slope must be assessed to the lands in the whole district in the same proportion as the costs and expenses of the construction of such specific open ditch was originally assessed to said lands; and so much of the cost of the work and materials as is required to restore any tile line or tile lateral to its original efficiency, or to clean any tile line, or to replace broken or defective tile, or to rebuild any bulkhead, must be assessed to the lands benefited by such specific tile line or tile lateral in the same proportion as the original cost thereof."

Whether the proposed improvement is a repair or a new construction has been many times before this court. We will not undertake to consider all the cases, but will quote from a few of them.

In Chicago & N. W. R. Co. v. Board of Supervisors, 187 Iowa 402, a similar question was before this court. The court said:

"If, however, when the original drainage system of a given district has been completed, and put to practical test, it is found that a natural, unimproved channel, relied upon to serve the purposes of a lateral or tributary to the completed ditch, does not perform that office satisfactorily, the replacement or substitute of a new ditch for such natural channel is not a repair of the old improvement, but the making of a new one." .

In the case at bar, the "plan" which was finally adopted by the board of supervisors before the construction contemplated

that approximately 1,300 feet of the old North Skunk River, in the middle of which was located the intervener's dam, should constitute a part of the drainage district. The petition which inaugurated the proposed improvement now before us discloses that this plan proved unsatisfactory, the dam produced too much back water, and as a consequence, the outlets to tile drainage into the ditch became clogged; so by this new improvement it is proposed to build 1,290 feet of new ditch, which will entirely eliminate the dam, and as is supposed, will keep the tile outlets at the ditch open.

In Bloomquist v. Board of Supervisors, 188 Iowa 994, a similar question was before this court. In that case, the construction "involved no change of the boundaries of the former district or of the line of location of the former drain." The cost of the improvement was greater than the original cost. The court said, among other things:

"The distinction between a new improvement and the mere repair of an old one is not always readily drawn. In doubtful cases, the comparative cost of the additional improvement, as compared to the cost of the original improvement is an important circumstance in the solution of doubt. Ordinarily, repairs are supposed to cost only a part, and usually a small part, of the cost of the original improvement."

In the case at bar, it will be noted, the engineer estimates the cost of the improvement at $2,500. To this must be added the damages which are to be paid to the intervener. They have been appraised at $7,500. The intervener is claiming damages in the amount of $55,000. That question is not before us.

We do not overlook Petersen v. Sorensen, 192 Iowa 471, in which it is held, in substance, that the "fact that the cost of improving an existing drainage improvement is far in excess of the original cost of construction does not necessarily stamp the improvement as original construction."

In Walker v. Joint Drain. Dist., 197 Iowa 351, this question was squarely before this court. Many of the cases are there collected and considered. An examination of this case will disclose that in many particulars it is much like the case at bar. The court said:

"The 'repair' that became necessary because of the condi-

tion was not a 'repair' of the physical improvement as made upon the land, but it was a 'repair' of the plan of the engineer who designed the original improvement which was adopted by the board of supervisors. In other words, the original plan for the drainage of this tract of land was inadequate and insufficient to do the work. * * * To repair means 'to restore to a sound or good condition after decay, injury, dilapidation, or partial destruction.' American Bonding Co. v. City of Ottumwa, 137 Fed. 572. See, also, Dougherty v. Taylor & Norton Co., 5 Ga. App. 773 (63 S. E. 928); Walker v. City of Detroit, 143 Mich. 427 (106 N. W. 1123); Brown County v. Keya Paha County, 88 Neb. 117 (129 N. W. 250).''

In the case at bar, as has been seen, the original "plan" under which the ditch was constructed has been changed to a "plan" which carries the water of the river entirely around instead of over the intervener's dam. The proposed construction is under a changed "plan," and it is difficult to see how this work which would be done entirely under a change of "plan" can be construed to mean a "repair" under the old "plan."

Moreover, the engineer estimates the cost of the improvement at $2,500. The claim of the intervener has been *allowed* for $7,500. The total thus estimated is $10,000. Manifestly, this is 10 per cent of $100,000, and more than 10 per cent of the original cost of this ditch, which was $77,842, in round figures.

Manifestly, under such circumstances and under the provisions of Section 7559, hereinbefore quoted, the board has failed to properly proceed, and it was without jurisdiction. Said Section 7559 provides that under such circumstances ''the same proceedings shall be had and the same rules shall be applied as are provided in this chapter for an original establishment and assessment.''

After a very careful examination of the entire record and of the previous holdings of this court, we hold that the proposed improvement is not a repair, but a new construction, and that a petition, notice, and bond, as provided by statute for new construction, were necessary.

The cost, as estimated, is more than 10 per cent of the original cost of the ditch, and procedure as for an original establishment and assessment was necessary.

It follows that the board was without jurisdiction, and

1398

therefore its acts were null and void. In such cases, injunction is a proper remedy, notwithstanding the provisions of Section 7527, which, among other things, provides that the remedy by appeal is exclusive. See Chicago & N. W. R. Co. v. Sedgwick, 203 Iowa 726; Hoover v. Iowa State Highway Com., 207 Iowa 56.

There are other questions involved which, under our view of the case as herein expressed, need not be considered.

It follows that the cause must be, and is,—Affirmed.

WAGNER, C. J., not participating.

All other justices concur.