Peter VOOGD et al., Appellants,

v.

**JOINT DRAINAGE DISTRICT NO. 3–11, KOSSUTH AND WINNEBAGO COUNTIES, Iowa, et al., Appellees.**

No. 54281.

Supreme Court of Iowa.

June 17, 1971.

Fitzgibbons Brothers, Estherville, for appellants.

Laird, Burington, Bovard & Heiny, Mason City, for appellees.

Weible & Stipp, Forest City, amicus curiae.

MASON, Justice.

This is an appeal by plaintiff-landowners in lateral 9 of joint drainage district No. 3–11 of Kossuth and Winnebago counties from the trial court's decree dismissing their petition in equity asking to have certain drainage assessments against their land declared illegal and void. In one division plaintiffs seek to enjoin collection of assessments for repairs and in the other, to recover assessments paid by some plaintiffs. Our review is de novo. Rule 334, Rules of Civil Procedure. For a related case see Thompson v. Joint Drainage Dist. No. 3–11, 259 Iowa 462, 143 N.W.2d 326.

The joint district involved is an inter-county drainage district consisting of a main ditch serving the entire district comprising a large area in the two named counties. It includes 11 laterals extending from the main ditch which are designated by numbers one to eleven inclusive and numerous numbered drainage districts. The original cost of lateral 9 with improvements before the present proceedings was $15,054.40.

Defendants are members of the board of supervisors of Winnebago and Kossuth counties and have general supervision of the joint drainage district including lateral 9. The land served by this lateral is in Winnebago county. The county auditor and county treasurer of Winnebago county are other defendants and are connected with the assessments and collection of certain special assessments levied and assessed by the joint boards which are the subject of controversy in this action.

By 1963, lateral 9 had partially filled with soil and vegetation. At the request of the joint board of supervisors Ralph H. Wallace, a licensed and practicing drainage engineer, examined and surveyed lateral 9 early in the year 1963. By letter of July 26, 1963, to the board of supervisors, Winnebago county, he reported that the channel of the open ditch was clogged with silt and that two road culverts should be lowered at the expense of the county. He recommended that the ditch be cleaned out to grade and some trees and brush removed. Mr. Wallace estimated the cost to be $3610. He further recommended that because of the amount involved that the work be done without the formal contract or taking bids.

Unfortunately the engineers' cost estimate contained a flagrant error which they admitted in a letter to the supervisors after the repair was completed:

"This job greatly exceeded our estimate of cost due to a mistake in our office in computing the quantities. Because of the regularity of the ditch cross-section, we took sections at 3 to 400-foot intervals, but the quantities were inadvertently computed on the basis of 100-foot sections, resulting in a total estimate that was between $\frac{1}{3}$ and $\frac{1}{4}$ of the quantity that we should have reported."

On August 1, 1963, unaware of the error in the estimate and without notice or hearing, the supervisors ordered the repair to be made and employed one Leonard Harmon for the job at the rate of $14 per hour for dragline work and $15 per hour for bulldozer work.

Harmon began work soon and eventually completed the repair. He received the following payments for his work:

| Date | Payment | Cumulative |
|---|---|---|
| September 1, 1963 (4 warrants totaling) | $3,052 | $ 3,052 |
| October 1, (3 warrants totaling) | $2,268 | $ 5,320 |
| November 1, (3 warrants totaling) | $2,296 | $ 7,616 |
| December 2, (4 warrants totaling) | $3,520 | $11,136 |
| January to July, 1964 | $4,660 | $15,796 |

At about the time of the payment on November 1, the supervisors called the amount of the payments to the engineers' attention. By then the payments were over $7600 and the ditch was only about half-way cleaned out. The engineers then admitted they were "way off" in their estimate, whereupon, the supervisors directed the repair be completed. The final cost including incidental expenses was $20,500 which on December 14, 1964, the supervisors levied upon the lands served by the lateral. This was certified by defendant county auditor to the defendant county treasurer and entered upon the records in his office as a tax and assessment against all lands in lateral 9, which includes lands of plaintiffs. These assessments were payable on or before March 31, 1965.

Plaintiffs Peter Voogd, Alice Voogd, Lewis Jensen, Nanne W. Frerichs, Jennie Frerichs, Gordon O. Hagen, Verna R. Hagen, Bernard C. Smith, Elizabeth Smith and Lottie Jensen availed themselves of the right to pay their assessments in installments, as provided under section 455.-

64, Iowa Code, 1962, and signed a waiver in connection with their improvement certificate in the following form:

"I, _____, in consideration of having the right to pay assessment mentioned in within certificate in installments as provided by law, do hereby waive all objections to said assessment and the issuance of this certificate and further agree that I will not make any objections of illegality or irregularity as to said assessment or to the issuance of this certificate and that I will pay the same with interest thereon at the rate of four per cent per annum from date of said assessment."

Plaintiffs Gordon O. Hagen and Verna R. Hagen, have since paid their assessment in full. Plaintiffs Peter Voogd and Alice Voogd, paid the one installment due March 31, 1966 and plaintiffs Lewis Jensen, Nanne W. Frerichs, Jennie Frerichs, Bernard C. Smith, Elizabeth Smith and Lottie Jensen have paid their annual installments as they became due.

All other plaintiffs have paid their assessments in full.

In dismissing plaintiffs' petition the trial court found that although no notice of the intended assessment was given, nevertheless, the assessments were legal and valid because (1) defendant board of supervisors had jurisdiction to make the levy when it received an engineer's estimate which did not exceed 50 percent of the original cost of the district plus subsequent improvements and (2) competitive bidding was not necessary and (3) those plaintiffs who signed a waiver in order to pay the assessments in installments waived all right to object to the illegality of the assessments.

I. The foundation of the appeal is the supervisors' failure to give notice and hold hearing regarding the proposal to repair, under section 455.135(1), Code, 1962.

The issues presented are twofold: (1) Are the proceedings of the supervisors void for want of notice and hearing at the outset? (2) Are the proceedings void be-cause the supervisors completed the project without notice and hearing after they learned the estimate was "way off?"

Before approaching these problems, some preliminary factual and legal matters need to be considered. Factually, no one suggests that the repair to the ditch was not needed, or that the repair was not properly and completely made, or that Harmon's charges were excessive. Nor is fraud or collusion shown. Plaintiffs were not charged for what they did not get, nor were they charged excessively for the work which was done. The cleanout was simply a big job, and the expense was correspondingly substantial. Much more earth and debris had to be moved than the engineers estimated.

■ Legally, this suit is not a direct appeal from supervisors' proceedings under section 455.92, Code, 1962. This is a collateral attack. Notwithstanding that section 455.106 provides, "The remedy by appeal provided for in this chapter shall be exclusive of all other remedies," landowners can maintain an independent suit such as the present one, subject to this limitation: to succeed they must show that the proceedings are not merely irregular but are void. Maasdam v. Kirkpatrick, 214 Iowa 1388, 243 N.W. 145; Danielson v. Cline, 234 Iowa 167, 12 N.W.2d 254.

■ In testing proceedings of supervisors, three principles apply: the drainage statute as a whole is liberally construed to carry out the beneficial purpose of draining wet lands (section 455.182); strict compliance with the provisions of the statute is required on the organization of a drainage district, whereas "substantial compliance is sufficient" as to subsequent repair or improvement; and a board of supervisors is not held to the procedural niceties of law courts—the requirements imposed on a board of supervisors "should not be too technically construed, lest its efficiency be wholly paralyzed." Thorson v. Board of Supervisors, 249 Iowa 1088, 1094, 1097, 90 N.W.2d 730, 734, 735.

II. Are the supervisors' proceedings void for want of notice and hearing at the outset?

█ The case does not involve the establishment of a drain. Rather, it involves the "maintenance, cleaning, and repair" of an established drain. 28 C.J.S. Drains § 45 at 380. A drain once completed is under the supervision of the supervisors, and they can be compelled by mandamus to maintain it and keep it in repair. Morrow v. Harrison County, 245 Iowa 725, 64 N. W.2d 52. Their broad authority to repair is granted by the following portion of section 455.135(1), Code, 1962 (the applicable statute when this repair was made):

"When any levee or drainage district shall have been established and the improvement constructed, the same shall be at all times under the supervision of the board of supervisors except as otherwise provided for control and management by a board of trustees and it shall be the duty of the board to keep the same in repair. The board at any time on its own motion, without notice, may order done whatever is necessary to restore or maintain a drainage or levee improvement in its original efficiency or capacity, and for that purpose may remove silt or debris, repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity. In the event permanent restoration of a damaged structure is not feasible at the time, the board may order such temporary construction as it deems necessary to the continued functioning of the improvement. If in maintaining and repairing tile lines the board finds from the engineer's report it is more economical to construct a new line than to repair the existing line, such new line may be considered to be a repair."

The present work constituted repair, but the legal problem is this. The lateral previously cost a total of $15,054.40. Of that amount, 50 percent would be $7527.20, whereas the actual cost turned out to be

$20,500. Section 455.135(1), just quoted, continues:

"Provided, however, if the *estimated cost* of repair exceeds fifty percent of the original total cost of the district and subsequent improvements therein as defined in this section, the board shall set a date for a hearing on the matter of making such repairs, and shall give notice as provided in sections 455.20 to 455.24, inclusive. At such hearing the board shall hear objections to the feasibility of such repairs, following the hearing the board shall order made such repairs as it deems desirable and feasible. Any interested party shall have the right of appeal from such orders in the manner provided in this chapter." (emphasis supplied). (The cost of construction and improvements "of the district," as just quoted, means the cost of construction and improvements "of the lateral," where only a lateral is involved. Thompson v. Joint Drainage Dist. No. 3–11, 259 Iowa 462, 143 N.W.2d 326.)

█ The supervisors in the present case did not give plaintiffs notice of the contemplated repair, nor was a hearing held. No necessity to do so appeared at the time because the "estimated cost" of repair was $3610, whereas the statutory amount before notice and hearing were required was $7527.20. But the estimate contained a latent defect of which the board was unaware. Are the assessments void at the outset because the actual cost turned out to be substantially higher than the estimated cost on which the board based its action?

In Miller v. City of Glenwood, 188 Iowa 514, 526–527, 176 N.W. 373, 378, which involved an unexecuted contract, this court stated:

"It is quite impossible, in estimating the cost of a public work of this kind to determine in advance the actual cost the city will incur in its completion. The estimate often proves inadequate. It is only for the purpose of advising those who may be called upon to meet the expense, when incurred, of the probable cost, as a basis for

concluding whether probable cost will exceed the probable benefits to be conferred by the improvement. If cities were to be held to a strict rule in estimating costs, it would never be safe to enter upon any scheme of public improvement. After the estimate, and before the contract is let, there may be such an increase in wages and cost of material that it would be utterly impossible to perform the work within the limits of the estimate. In the absence of fraud or collusion or something of that sort, the fact that the completed work exceeds the amount of the estimate does not leave the city without jurisdiction to assess abutting property its proportionate share, measured by the rules governing the special assessment."

In other jurisdictions where the question of a governing body acting on an erroneous estimate of cost has been raised the courts have generally taken the position that mere fact the estimate proved wrong does not take away the governing body's power to act. Branting v. Salt Lake City, 47 Utah 296, 153 P. 995; Hill v. Swingley, 159 Mo. 45, 60 S.W. 114; Probert v. Garth, 155 Mo.App. 387, 137 S.W. 320; Kelley v. Morton, 179 Mo.App. 296, 166 S.W. 840.

The rationale of these decisions is applicable to the case at bar by virtue of the express language of section 455.135(1). That statute clearly contemplates there shall be an engineer's report, as it refers to an "engineer's report" in those terms. It then specifies the condition under which notice and hearing are required: "if the *estimated* cost of repair exceeds fifty per cent"—not if the "actual" cost turns out to exceed fifty per cent. Section 455.135(1) (emphasis supplied). The supervisors are thus governed in their procedure by the *estimate* of the cost, and, if they act in good faith, they can order repair without notice and hearing when the estimate is less than 50 percent of original cost and improvements, as it was here.

The prior cases of this court point in the direction of the conclusion just reached.

Welch v. Borland, 246 Iowa 119, 66 N.W.2d 866; Johnson v. Monona-Harrison Drainage Dist., 246 Iowa 537, 552, 68 N.W.2d 517, 526. In Welch this court looked to the engineer's report on the question of whether notice and hearing were necessary. In Johnson, two issues were discussed: whether the project was technically a repair or an improvement and whether the amount of the cost necessitated notice and hearing (25 percent of original cost under that statute). The supervisors urged that they were entitled to rely on the engineer's report altogether, but this court differentiated the two issues, saying:

"It is the contention of the board that it was given the power and authority to determine whether or not a submitted survey is sufficient and appropriate to determine the nature and extent of the proposed improvement, and once decided in good faith by the board it is not subject to court review. This view appears to have been favored somewhat by the trial court. We need not go that far herein. It is true when the *estimated costs* of the proposed project are less than twenty-five per cent of the original cost of the district, *the board may order the work done without notice.*" (emphasis supplied)

Consequently, although the estimate turned out to be substantially erroneous, the supervisors acted in good faith on the basis of an estimate which was less than the statutory amount necessitating notice and hearing. Therefore, their initial action authorizing the repair without notice and hearing will not be held void in this suit commenced after the work was completed and benefit bestowed.

■ III. However, the conclusion just reached does not mean that after the supervisors undertook the repair, they were legally entitled to have it completed after discovery of the engineering error without compliance with Code, 1966, section 455.-135.

In Thompson v. Joint Drainage Dist. No. 3–11, 259 Iowa 462, 470, 143 N.W.2d

326, 331, this court held: "Failure to provide hearing and give notice as required by statute voids the entire assessment." It is undisputed that upon discovery of the error, the appellees made no effort to comply with Code, 1966, section 455.135 by giving notice and holding a hearing. Thus, the liberal construction and interpretation of drainage statutes as demanded by Iowa Code, 1966, section 455.182 (See also Thorson v. Board of Supervisors, 249 Iowa 1088, 1095–1096, 90 N.W.2d 730, 734, and cases cited therein) is impossible where there is absolutely no compliance.

The fact 455.135 only mentions "estimated cost" makes no difference since the basic intent of the legislature was to require notice and a hearing whenever a substantial expenditure would be made. Hays, Special Assessments, 12 Drake L.Rev. 1, n. 75. If this was an emergency the view expressed might be different. However, would the delay of a few weeks to comply with the intent and provisions of the drainage statutes have been fatal to the successful completion of this non-emergency project? The answer indicated by the testimony in the record is that the project could have been stopped upon discovery of the error. Under this circumstance failure to halt the project and comply with the statutes is fatal to the democratic system of government. Our system of government by its very nature of requiring consultation with its citizens cannot be as efficient as a technocratic run governmental system. Consequently, the assessments made by the appellees are unenforceable. Thompson v. Joint Drainage Dist. No. 3–11, supra; Kelleher v. Joint Drainage Dist., 216 Iowa 348, 249 N.W. 401; Lade v. Board, 183 Iowa 1026, 166 N.W. 586.

Further, the fact the contractor involved will receive no compensation for his work even if he brought a court action against the appellees is not persuasive. In State ex rel. Iowa Employment Security Commission v. Des Moines County, 260 Iowa 341, 149 N.W.2d 288, this court indicated that drainage districts are political subdivisions of the counties. Furthermore, contracts made by a county that are beyond its power or in contravention of expressed statutes are void. Thus, the party who enters into a contract with a county or a political subdivision of a county does so at the peril that the political subdivision or county involved has not complied with or acted within its statutory mandate from the legislature. Even courts of equity cannot assist this party. Madrid Lumber Co. v. Boone County, 255 Iowa 380, 121 N.W. 2d 523; Harrison County v. Ogden, 133 Iowa 9, 110 N.W. 32.

As stated, by October 1, 1963 the total of warrants issued to the contractor was in excess of $5000. Error in the estimated cost should have been apparent to the boards at that time. By November 1, Harmon had been issued warrants in the total amount of $7616. About this time the board called the matter to the engineer's attention.

Although the order for repair was originally based on an estimated cost within the statutory limit and would be legal up until the cost thereof did not exceed $7527.20, once the boards discovered the estimate was meaningless and they were in to a project that was going to exceed the statutory limits permitted without notice and hearing the erroneous estimated cost could not furnish authority for the boards to issue more warrants and then seek to collect the amount thereof by assessments against plaintiffs' property.

Only through substantial compliance with Iowa law could the necessary authority have been bestowed upon the board to act. There was no such compliance after discovery of the error. Therefore, the excess over the 50 percent allowed under section 455.135 is void and assessments based thereon cannot be levied against plaintiffs' property.

IV. Defendants in answer to division II assert the waiver signed by certain plaintiffs prevents their present attack

on legality of the proceedings and assessments.

The trial court held that those plaintiffs who signed the waiver in connection with the installment payment or assessments waived all right to object to the legality of the order for repairs and the levy and assessment against their property. The court based this holding on the fact the waiver was provided for by statute and although the statute mentions "consideration" the effect of the waiver is not dependent on contractual principles.

Section 455.64 provides:

"Installment payments—waiver. If the owner of any premises against which a levy exceeding twenty dollars has been made and certified shall, within thirty days from the date of such levy, agree in writing indorsed upon any improvement certificate referred to in section 455.77, or in a separate agreement, that in consideration of having a right to pay his assessment in installments, he will not make any objection as to the legality of his assessment for benefit, or the levy of the taxes against his property, then such owner shall have the following options:

"1. To pay one-third of the amount of such assessment at the time of filing such agreement; one-third within twenty days after the engineer in charge shall certify to the auditor that the improvement is one-half completed; and the remaining one-third within twenty days after the improvement has been completed and accepted by the board. All such installments shall be without interest if paid at said times, otherwise said assessments shall bear interest from the date of the levy at the rate of four percent per annum, payable annually, and be collected as other taxes on real estate, with like penalty for delinquency.

"2. To pay such assessments in not less than ten nor more than twenty equal installments, the number to be fixed by the board and interest at the rate fixed by board, not exceeding four percent per annum. One such installment shall be payable at the March semiannual taxpaying date in each year; provided, however, that the county treasurer shall, at the March semiannual taxpaying date, require only the payment of a sufficient portion of the assessments to meet the interest and the amount maturing on bonds or certificates prior to the regular time for the payment of the second installment of taxes and the balance shall be collected with such second installment and without penalty.

"The provisions of this section and of section 455.65 to 455.68, inclusive, may within the discretion of the board, also be made applicable to repairs and improvements made under the provisions of section 455.135."

We construe this statute as expressing a legislative intent that in consideration of having the privilege to pay such assessment in installments a contract would be formed between the drainage district and the landowner whereby he would waive any objections to the legality of his assessment or the levy of taxes against his property.

Under this construction these installment waiver agreements are subject to the same principles of contract law as any other contract. Fitchpatrick v. Fowler, 157 Iowa 215, 138 N.W. 392. 5 Williston on Contracts, (Third Ed., Jaeger), section 682 has this statement, "A contract to excuse a condition or to surrender a right or a defense must be subject to the same rules as any other contract in this respect. If both parties made the bargain under a mistaken assumption of essential facts relating to the existence of the nature of the supposed right of action or defense, their bargain should be voidable; and if one knowing the facts, took advantage of the other's ignorance, it would likewise be voidable." Similarly, this court has stated "a waiver is a voluntary relinquishment of a known right, and, before it will be enforced, it must clearly appear that the party against whom it is demanded was in possession of

all material facts affecting the same." Norton v. Order of Foresters, 138 Iowa 464, 114 N.W. 893. See also 28 Am.Jur.2d, Estoppel and Waiver, section 158 and cases cited therein.

Applying these above stated principles to the case before this court, there is no evidence in the record that the plaintiffs involved ever received any sort of notification of the error in the estimate or were informed of the violation of Code, 1962, section 455.135. Thus, the defendants were taking advantage of plaintiffs' ignorance when the waivers were signed. Since there was a lack of knowledge on the part of plaintiff-landowners who signed the waiver as to a material fact, the contract is voidable at the option of the plaintiff-landowners.

By instituting this action plaintiffs signing the installment agreements have exercised their power of avoidance. Here again it follows the excess of 50 per cent allowed under section 455.135 is void and assessments based on such excess cannot be levied against the property of plaintiffs signing the waiver agreements.

V. As previously mentioned some plaintiffs seek recovery of assessments paid. In this connection we point out the cause of action alleged in division II of plaintiffs' petition is not one seeking to shift the whole burden or penalty to an innocent victim. The balancing of equities is not the same.

We therefore hold that upon remand all plaintiffs in this action who have paid assessments are entitled to a refund of such portion of their assessment which was levied to meet the cost of the entire repair in excess of $7527.20.

With directions for entry of a decree in accordance with this opinion the case is

Reversed and remanded.

All Justices concur except REYNOLD-SON, J., who takes no part and UHLEN-HOPP, J., and MOORE, C. J., who dissent.

UHLENHOPP, Justice (concurring in divisions I and II, dissenting from divisions III, IV and V).

The problem arose in this way. Supervisors are required to keep agricultural drains in repair. Code, 1962, § 455.135. At the time of the events in question, supervisors could proceed with repairs on their own initiative and assess the cost in accordance with the original apportionment of benefits in the district, when the estimated cost of repair did not exceed 50% of the original cost of "the district." § 455.135. If the estimated cost exceeded such 50%, notice had to be given and hearing held before repairs could be undertaken. The supervisors involved in this case thought the words "the district" mean the whole district, here, District 3–11. The estimated cost of the cleanout of Lateral 9 was $3,610, far less than 50% of the original cost of District 3–11. The supervisors undertook the cleanout of Lateral 9 without notice and hearing. During the cleanout, the supervisors discovered that the engineer's cost estimate was substantially erroneous. But the cost of the completed cleanout would still not approach 50% of the original cost of District 3–11. With the ditch cleaned out about halfway, still unaware that "the district" may mean something other than the whole district, and after consulting the engineer, the supervisors completed the cleanout on their own initiative. That was in 1964.

In 1969, this court decided Thompson v. Joint Drainage Dist. 3–11, 259 Iowa 462, 143 N.W.2d 326. The court held that "the district" in the statute means "the subdistrict" when only a lateral is involved. The original cost of Lateral 9 was $15,054.40. The estimated cost of $3,610 for the cleanout was thus considerably less than 50% of the original cost of Lateral 9. When the supervisors discovered the error in the estimate, however, they had expended around

$7,500 on the cleanout or about 50% of the original cost of Lateral 9. The completed cost of the cleanout, with incidental expense, was $20,500—in excess of the entire original cost of Lateral 9 but less of course than half of the original cost of the whole district. No one knows whether the supervisors would have given notice and held hearing at the time they discovered the mistake in the estimate, had they realized that "the district" means the subdistrict in the case of a lateral.

Will equity declare assessments void as to the portion of the cost of repair necessary to complete a project when the repair was properly commenced under a cost estimate requiring no notice and hearing; when, midway, the cost estimate was found to contain an error which if known at the outset would have required notice and hearing to undertake the repair; and when the supervisors proceeded in good faith but were under a misconception of law as to the necessity for notice and hearing in any event?

Several threshold circumstances are important. First, the suit in equity is a collateral attack on the assessments, not a direct appeal under chapter 455, Code, 1962. The statute provides that "The remedy by appeal provided for in this chapter shall be exclusive of all other remedies." § 455.-106. In view of that statute, equity will not intervene in a collateral attack to invalidate assessments unless the supervisors' proceedings are more than irregular; they must be void. Maasdam v. Kirkpatrick, 214 Iowa 1388, 243 N.W. 145. Second, the attack here came after the project was completed and the workman was paid. When an error in a cost estimate is discovered before the work is undertaken, equity is more prone to intervene. Much less disruption of the parties' rights will result from an injunction at the outset. Compare Koich v. Helena, 132 Mont. 194, 315 P.2d 811, with Lumbermen's Trust Co. v. Ryegate, 61 F.2d 14 (9th Cir.). See also Vincent v. South Bend, 83 Wash. 314, 145 P. 452. Third, the supervisors' action here

was not ultra vires. Drain repair is within the general powers of supervisors. Indeed, the statute requires supervisors to keep drains in repair, and their power under the statute has been declared to be "broad and comprehensive." Nelson v. Graham, 198 Iowa 267, 269, 197 N.W. 905, 906. The challenge is rather to the manner in which these supervisors exercised their power. Fourth, this is a suit in equity, not an action at law. Regarding the attendant equities no one suggests that the repair to the ditch was not needed, that the repair was not properly or completely made, that the workman's charges were not reasonable, that fraud or collusion existed, or that the landowners were charged for what they did not get. Much earth and debris had to be removed, and the cost was correspondingly substantial.

Under these circumstances the problem of whether equity will intervene to declare the assessments void or partially void may be approached from two standpoints: the language of § 455.135(1) and the intent of that statute.

I. *Language of Statute.* Section 455.135 refers to the engineer's report and provides that if the "estimated cost" of repair exceeds 50% of original cost, notice and hearing are required. The statute nowhere mentions the situation in which "actual cost" during performance exceeds "estimated cost" at the outset.

Examination of the decisions discloses that an excess of actual over estimated cost not infrequently occurs. All sorts of unanticipated difficulties and mistakes are encountered: rock, hardpan, or quicksand in the right-of-way, unrealized federal assistance, errors in estimates, faulty specifications, strikes, and whatnot.

Statutes in this area are of two main kinds. One kind anticipates the possibility of a discrepancy between actual and estimated costs and expressly prohibits assessments to be levied if actual cost exceeds estimated cost or invalidates assessments to the extent they are in excess of estimated

cost. Such statutes are enforced in accordance with their terms. Gainesville v. McCreary, 66 Fla. 507, 63 So. 914; Gilmore v. Hentig, 33 Kan. 156, 5 P. 781; Pope v. Rich, 316 Mo. 1206, 293 S.W. 373; Daehler v. Portsmouth, 45 Ohio App. 15, 185 N.E. 52 (assessments invalid to extent in excess of estimate); Rose Bros. v. Alva, 356 P.2d 1083 (Okl.); Johnson v. Utah-Idaho Concrete Pipe Co., 118 Utah 552, 223 P.2d 418. The second kind of statute does not deal with the problem of actual cost in excess of estimated cost but merely requires an estimate of cost at the outset; the procedure to be employed for the project is determined by that estimate. These statutes do not provide additional procedures in the event the estimate proves faulty. Nor do they restrict levy of assessments to the amount of the estimate. Under such statutes, although actual cost during construction exceeds the estimate the assessments are valid *provided the public authorities proceeded in good faith and no fraud appears.* Hoerth v. Sturgis, 221 Ky. 835, 299 S.W. 1074; Board of Councilmen of City of Frankfort v. Jillson, 225 Ky. 61, 7 S.W.2d 859; Campbell v. Plymouth, 293 Mich. 84, 291 N.W. 231; Kelley v. Morton, 179 Mo.App. 296, 166 S.W. 840; State v. Guttenberg, 38 N.J.Law 419; Bowdich v. Albuquerque, 76 N.M. 511, 416 P.2d 523; Aloha Sanitary Dist. v. Wilkens, 245 Or. 40, 420 P.2d 74; Miller v. Portland, 78 Or. 165, 151 P. 728; Borough of Conchohocken v. Tracy, 60 Montg. 350, 36 Mun.L.R. 104 (Pa.Com.Pl.); Branting v. Salt Lake City, 47 Utah 296, 153 P. 995; La Follette v. Fairmont, 138 W.Va. 517, 76 S.E.2d 572. This is true although the discrepancy in estimates and actual costs is large. Vincent v. South Bend, 83 Wash. 314, 145 P. 452.

The Iowa statute is of the second kind. First it imposes a general duty on supervisors to keep drains in repair. Then it provides that if the estimated cost exceeds 50% of original cost, notice and hearing are necessary. Thus notice and hearing expressly hinge on the estimate. Nowhere does the statute state that if, during performance, the supervisors learn that actual cost will exceed estimated cost additional proceedings must be taken. To impose that requirement would engraft words on the statute which are not there: "provided, if during performance it appears actual cost will exceed estimated cost, the work shall be halted and proceedings shall be taken based on actual cost." Moreover, the Iowa statute nowhere limits levy of assessments to estimated cost or to any fixed amount. To impose that restriction would transform the statute from the second kind, which it is, into substantially the first kind, which it is not, and would add further words which are not there: "but no assessments shall be levied in excess of 50% of original cost."

II. *Intent of Statute.* Three situations can arise. First, the estimated and actual costs may both be less than 50% of original cost. In that case the statute does not require notice and hearing. Second, the estimated and actual costs may both exceed 50% of original cost. Then the statute expressly requires notice and hearing. Third, the estimated cost may be less than, and the actual cost more than, 50% of original cost. The statute does not deal with that situation except as it expressly hinges notice and hearing on estimated cost. In this third situation should equity take upon itself the partial voiding of assessments when no legislative authorization exists to do so, when the supervisors acted in good faith, and when the subdistrict received the benefit of the work? The answer should be in the negative for several reasons.

First, traditional broad application of drainage law is against imputing an intention to the legislature that assessments shall be wholly or partially voided under circumstances such as exist here. The whole development of Iowa drainage law, including the powers of supervisors, has been one of liberality. This approach has been a substantial factor in making practical and possible the transformation of

large swamp areas of Iowa into productive agricultural land. The Iowa Constitution grants broad authority to the legislature as to drainage. Iowa Const.Amend.1908. Under the constitution, the legislature has enacted a comprehensive drainage statute and has expressly provided that the statute "shall be liberally construed." § 455.182. Under that statute, this court has been opposed from the beginning to a narrow interpretation of the drainage law and of the powers of supervisors who proceed in good faith. Thorson v. Board of Supervisors, 249 Iowa 1088, 90 N.W.2d 730. This is true regarding the power to repair, specifically. Johnson v. Monona-Harrison Drainage Dist., 246 Iowa 537, 68 N.W.2d 517. To void assessments partially where supervisors are confronted with an unanticipated problem during a project and in good faith work out the problem with no actual loss to the district would go against the historical position of the legislature and the court in this area of law.

Second, precedent is against a claim of legislative intent to void the assessments in whole or in part. The decisions do not hold that the law intends new proceedings shall be taken midway under circumstances such as these.

The leading case is Simpson v. Board of Supervisors, 186 Iowa 1034, 171 N.W. 259. Three substantial changes during performance occurred there. The plan contained an error as to the lower portion of the ditch, necessitating a widening of the right-of-way from 85 feet to 130 feet. This obstacle to performance also led to changes in the plan to run the main ditch differently toward the outlet and also to straighten a horseshoe bend in the river constituting the outlet. The plaintiff claimed these substantial changes required additional proceedings. This court held to the contrary, saying, "[I]t would disclose a very grave defect in the law, if the proceedings for the removal of this obstacle were necessarily to be treated as an original proceeding for the establishment of an individual drainage district." 186 Iowa at

1040, 171 N.W. at 261. Other courts have held similarly where various mistakes and problems were encountered during performance, rendering the estimate of cost erroneous. Davies v. Los Angeles, 86 Cal. 37, 24 P. 771; Auditor General v. Chase, 132 Mich. 630, 94 N.W. 178 (estimate $40,000, actual $70,000); Nash v. St. Paul, 23 Minn. 132. This was said in the drainage case of Sheridan v. Fleming, 93 Mo. 321, 324–325, 5 S.W. 813, 814: "There is nothing in the act which limits the amount to the estimate first made by the commissioners. The law does not contemplate that they must in the first instance report the exact amount of work. It would be impossible for them to do this * * *." The court said in State v. Guttenberg, 38 N.J.L. 419, 20: "[I]ts error arose chiefly from the fact that more rock was found at the grade than was anticipated. * * * Under these circumstances, *and in the absence of any evidence of fraud,* the municipality ought not to be estopped by such estimate, and precluded from imposing on those whose property was benefited, the real cost of the work, to the extent of their constitutional liability." (Italics added.) In Moran v. Jersey City, 58 N.J.L. 144, 148, 35 A. 950, 951: "The preliminary assessment * * * was only an estimate made upon what was perceived on the surface of things, to give the property owners a general knowledge of the approximate expenses of the improvement; but the cost of the work was increased by unforeseen and unavoidable difficulties in progress. The work proved to be of a somewhat different character from that anticipated. The preliminary estimate of expense cannot be allowed to absolutely control the commissioners in their final assessment." In McDonald v. Hornberger, 21 Ohio N.P. (n.s.) 209, 214: "Without a statute expressly limiting the cost to the estimate, it cannot fairly be said that the construction to be placed upon the estimate should serve the purpose guaranteeing to the property owner that the actual cost would not exceed the amount of such estimate." In Branting v. Salt Lake City, 47 Utah 296,

306, 153 P. 995, 999: "[A]ppellant was clothed with full power and authority to make the improvement and to assess the levy and the tax in question, and the mere fact that the estimate was too low, *in the absence of express statutory provision to the contrary,* cannot take away that power or authority." (Italics added.) See also Hill v. Swingley, 159 Mo. 45, 60 S.W. 114; Probert v. Garth, 155 Mo.App. 387, 390, 137 S.W. 320, 321 ("This goes to show that the estimate was a poor one; but we do not see how it can affect the validity of the tax bills."); Kelley v. Morton, 179 Mo.App. 296, 298, 166 S.W. 840, 841 ("that the actual exceeds the estimated cost will not invalidate the tax").

A mistake of large proportions was involved in Vincent v. South Bend, 83 Wash. 314, 318, 145 P. 452, 453. There the public authorities commenced the project under the mistaken assumption that the federal government would assist substantially. During performance the assumption turned out to be untrue. The court held that the authorities, once into the project, could in good faith complete it, though the cost to the local government rose from $9,500 to $89,199.92. The court said:

> The amount of the excess is large in this case, but there is no showing that the excess amount does not represent the actual *bona fide* cost of the improvement. In fact, there is no attempt to make such a showing; it being conceded, so far as the record goes, that the ultimate cost was the *bona fide* actual cost. The excess is readily accounted for when it is understood that, instead of being made at a nominal cost, as was first contemplated under the arrangement with the government engineers, it was necessary to make arrangements with private contractors to complete the work that should have been undertaken and completed under the contract with the government engineers, thus largely increasing the cost of the improvement, but not increasing the assessment beyond the actual *bona fide* cost of the improvement. Such an assessment is valid.

Cf. McGuire v. Voight, 242 Iowa 1106, 49 N.W.2d 472 (estimate of number of trees to be removed from ditch more than 50% wrong); Miller v. Glenwood, 188 Iowa 514, 527, 176 N.W. 373, 378 (*"In the absence of fraud or collusion or something of that sort,* the fact that the completed work exceeds the amount of the estimate does not leave the city without jurisdiction to assess abutting property its proportionate share, measured by the rules governing the special assessment." Italics added.)

Third, practicalities militate against legislative intent to void the assessments wholly or partially. The situation should be viewed as it appeared to the supervisors at the time, not with the hindsight we possess. The supervisors discover they have an erroneous estimate. The ditch is dug out about halfway. The ditch as then repaired would afford no relief to the upper landowners who were not yet reached. Yet it would be larger than the lower landowners alone would need, as it was being dug out to a depth and width to handle the water in the entire length of the subdistrict. If the project were stopped halfway because of the unanticipated additional cost, how would the supervisors assess the benefits for the costs already incurred? The unreached upper landowners could not be assessed; they would receive no benefit. Yet the lower landowners could not be assessed for the full cost of a larger cleanout than their lands alone needed.

Then what defense would the supervisors have if some upper landowner brought mandamus against them to complete the cleanout? Supervisors can be compelled by mandamus to clean out ditches. Morrow v. Harrison County, 245 Iowa 725, 64 N.W.2d 52.

With the benefit of hindsight, we can say the supervisors might have done differently. But the supervisors, as practical men confronted with a practical problem,

proceeded as the supervisors did in Simpson v. Board of Supervisors, supra. They completed the project as best they could so that the subdistrict would have a functioning drain throughout. No one suggests that the cleanout could have been completed at less cost if further proceedings had been taken by the supervisors. Plaintiffs' claim must be that such further proceedings would necessarily have resulted in discontinuance of the project. Can we ascribe an intention to the legislature that a project such as this one is to be abandoned half completed? This was stated in the Simpson case (186 Iowa at 1043–1044, 171 N.W. at 262):

It is no unusual thing for the estimates of the cost of a public work to prove inadequate, but, generally speaking, *this does not justify an adandonment of the work and the subsequent waste and loss of investment already made.* (Italics added.)

Finally, what should ultimately govern the result in a suit in equity of this kind? The equities. Since the statute does not provide for additional proceedings if a mistake is discovered during performance or limit assessments to any fixed amount, plaintiffs seek the intervention of the district court in chancery to relieve them from paying for the cleanout.

Little equity can be found in plaintiffs' claim. Even partial invalidation of the assessments would result in a windfall to plaintiffs—a full cleanout at half price.

As to the equities on the other side, if the supervisors had acted in bad faith we would have a different case. If they and the workman had connived, if the workman had charged an excessive amount, if he had not properly dug out the dirt and debris, if the landowners had not received the benefit of the cleanout, in short, if there had been "fraud or collusion or something of that sort," equitable grounds for intervention would appear. Miller v. Glenwood, 188 Iowa 514, 527, 176 N.W. 373, 378. But all of those equitable considerations are the other way.

The trial judge as chancellor weighed the equities and concluded that he should not invalidate the assessments, and his decree should be affirmed.

MOORE, C. J., joins in this dissent.